United States Court of Appeals,

Fifth Circuit.

No. 93-5131.

Patricia GREENSPAN, Plaintiff-Appellant,

v.

Donna E. SHALALA, Secretary, Department of Health and Human
Services, Defendant-Appellee.

Nov. 21, 1994.

Appeal from the United States District Court for the Eastern
District of Texas.

Before SMITH and EMILIO M. GARZA, Circuit Judges, and BERRIGAN,
District Judge.[*]

JERRY E. SMITH, Circuit Judge:

Patricia Greenspan ("Greenspan"), an applicant for Social
Security disability insurance and supplemental security income
benefits ("SSI"), appeals the Secretary's determination that
Greenspan was not disabled within the meaning of the Social
Security Act (the "Act").  Because we find that the Secretary's
decision is based upon substantial evidence and is in accordance
with law, we affirm.

I.

Patricia Greenspan was fifty-two years old when she applied
for disability payments.  She has a high school education, one year
of junior college, and one year of vocational school.  For most of
her life, she worked primarily as a sales manager, clothing buyer,
and supervisor in the clothing business;  she also has held

---

[*]District Judge of the Eastern District of Louisiana,
sitting by designation.

1

numerous clerical positions. From 1984 to 1987, she in turn worked at Lefcourts Imports, a Jordon Marsh department store, and the Doral Country Club Pro Shop. She was also a part-time bookkeeper for her landlord and a receptionist and clerk at a hospital. All these positions were held for only a brief period of time.

Greenspan's relevant medical history began in 1979 with the diagnoses of her treating physician, Dr. Martin Cohen, a specialist in endocrinology and metabolism. While Greenspan had alleged complaints relating to virtually every body system,[1] Cohen's

---

[1]According to the administrative law judge's (ALJ's) summation of Greenspan's testimony, her physical and mental symptoms include:

> chest pain, intense fatigue, confusion, unusual sleepiness, brain swelling, difficulty in recalling words, memory loss, episodic catatonic state (sitting and staring straight ahead/stopped movements), swelling in all veins, blurred vision, feeling of being unreal, chills, hot flashes, runs a low grade fever most of the time, red blotches, fear, depression, reactions that mimic anxiety attacks, blackouts, headaches, swelling and tenderness in the joints, high blood pressure, visual motor deficits, disorientation, inability to concentrate, hearing loss, pressure or pain in left eye, eyeballs feel swollen, exertional and non-exertional shortness of breath, lightheadedness, spacey feelings, rapid heartbeat, slow heartbeat, pale and clammy skin, flushed and puffy skin, rashes, red sores on face, numbness, loss of grip strength, motor loss in knees and legs, stiff knees and legs, blisters on extremities, lumps, sensitivity to light, difficulty in swallowing, choking, edema and burning of knuckles left wrist, frozen wrist, hot and swollen knees, swelling or lump on left ribs, burning thighs, leg and feet aches, bones hurt, pain from clothes touching body, cysts in left breast, swelling and pain in breast, swelling on top center of head, cerebral allergy, indigestion, crushing squeezing numbness in chest and forearm, fluid retention, intolerance to florescent lights, muscle spasms, nasal congestion and sneezing, slurred speech, veins in left arm and leg swell and itch, line of red rash along vein on left

examination found no physical basis for Greenspan's problems. He opined that "there is an enormous amount of emotional overlay contributing to her illness."

From March 1983 to May 1985, Greenspan saw Dr. Hobart Feldman, a specialist in allergy and immunology. He is also a "clinical ecologist." Feldman concluded, in contrast to Cohen's diagnoses, that Greenspan was "severely affected with ecological illness, and multiple allergies." According to Feldman, Greenspan's condition prevented her from being able to perform any type of work.

Greenspan's condition did not prevent her from consulting medical professionals, however. During this approximate period, she was counseled for emotional problems by a psychology intern of the Department of Youth and Family Development. At separate times, Greenspan also was examined by Dr. Norman Gaylis, Dr. Norman Azen, Dr. Robert Fox, and numerous physicians and interns at the Jackson Memorial Hospital and the North Miami Hospital. The blanket findings of these examinations was that no physical explanation could be found for Greenspan's numerous complaints, test results were within normal limits, and she suffered from emotional or psychosomatic aliments. Significantly, Azen did observe "dermographism," the raising of whelps resulting from moderately firm stroking or scratching of the skin.

In September 1985, Greenspan applied for disability insurance and SSI benefits under titles II and XVI of the Act, 42 U.S.C. §§

---

inner forearm and along side ribs and stomach, excessive salivation, emotional liability, fungus on toenails.

423 and 1381a (1991), claiming she suffered from ecological illness and chronic anxiety reaction. She contended that she had multiple allergies to almost everything in the work environment that caused respiratory, arthritic, neurological, cerebral, and other symptoms. She later amended her application to reflect a March 1983 onset date.

Meanwhile, upon Feldman's recommendation, Greenspan began seeing Drs. William Rhea and Ralph Smiley, specialists in clinical ecology and "environmental medicine." Rhea placed Greenspan in a "safe-house," a chemically free environment, where she was instructed to consume only organic foods and bottled water. Rhea also made a list of Greenspan's subjective responses to various molds, plants, animals, and chemicals. Some medical testing was done, and Rhea found evidence of Epstein-Barr virus. Greenspan, however, did not follow up on this testing, and no conclusive result was reached. Based upon their observations, Rhea and his associates concluded that Greenspan would not be able to perform any occupation because of her immune system dysfunction.

A hearing was held before an ALJ, who rendered a decision partially favorable to Greenspan, whom he found to be disabled after June 19, 1987.

Greenspan requested reconsideration. Additional evidence was entered into the record. Russell Mitchell, a clinical psychologist, conducted a psychological evaluation and diagnosed atypical somatoform disorder and histrionic personality. Dr. Joel Mulhauser, a specialist in internal medicine, submitted a report

4

questioning the validity of "ecological medicine." His review of Greenspan's medical records showed no objective medical findings of immune deficiency or other physical explanation for her alleged symptoms. The Appeals Council vacated the ALJ's decision and remanded for additional medical evidence.

A second hearing was convened, and the ALJ considered evidence derived from three consultive examinations. Dr. Lawrence Muirhead, a clinical psychologist, concluded that Greenspan was not impaired by any psychological dysfunction. Another consultative psychiatric evaluation was performed by Dr. Henry Gardiner, whose findings were consistent with Muirhead's.

Dr. John Pippin performed a consultative internal medicine examination and found no objective evidence of any major illness and no physical limitations except for avoiding dust, fumes, and chemicals. This time, the ALJ determined that Greenspan's impairments did not preclude her from performing her past relevant work, and, therefore, she was not disabled within the meaning of the Act.

Again Greenspan appealed, and the Appeals Council determined that further evaluation of the record was necessary, this time on the question of her subjective complaints. The decision was vacated and remanded, and a third hearing was held.

Further medical evidence was gathered. Dr. William Lumry, an allergist, was unable to make a diagnosis that would explain Greenspan's reported symptoms. Because of Greenspan's dermographia, he was unable to perform skin testing for allergies.

5

He instead ordered a "RAST" screen, which was completely negative and ruled out a significant number of possible allergies. Lumry also noted that dermographia would cause falsely positive results from skin tests such as those performed by Smiley and Feldman.

Another consultative psychiatric examination was performed by Dr. William Skinner. The ALJ heard testimony from a vocational expert, who testified that a person with Greenspan's background and impairments of moderate depression and severe allergies would be capable of doing light work.

The ALJ again denied benefits. An appeal was taken, and more extensive medical testing was done, this time diagnosing mitral valve prolapse and chronic fatigue syndrome. This time, however, the Appeals Council denied Greenspan's requests for review and reopening, and the Secretary's decision became final. Greenspan sought review in the district court, which approved of the report and recommendation of the magistrate judge and, over Greenspan's objections, dismissed the suit.

## II.

We review the Secretary's decision only to determine whether it is supported by substantial evidence on the record as a whole and whether the Secretary applied the proper legal standard. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Haywood v. Sullivan,* 888 F.2d 1463, 1466 (5th Cir.1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S.

6

at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). In applying the substantial evidence standard, we scrutinize the record to determine whether such evidence is present. *Haywood,* 888 F.2d at 1466. We may not reweigh the evidence, try the issues *de novo,* or substitute our judgment for that of the Secretary. *Id.*

The law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI. *Id.* at 1467. Disability under the Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to ... last for a continuous period of not less than twelve months...." 42 U.S.C. § 423(d)(1)(A). Under this provision, a "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). Furthermore, an individual is "under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." *Id.* § 423(d)(2)(A).

In determining whether a claimant is disabled, the Secretary utilizes a five-step sequential evaluation:

> (1) An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of

7

medical findings.

(2) An individual who does not have a "severe impairment" will not be found to be disabled.

(3) An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without the consideration of vocational factors.

(4) If an individual is capable of performing the work he has done in the past, a finding of "not disabled" will be made.

(5) If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

*Villa v. Sullivan,* 895 F.2d 1019, 1022 (5th Cir.1990) (paraphrasing 20 C.F.R. § 404.1520(b)-(f)). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen,* 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. *Abshire v. Bowen,* 848 F.2d 638, 640 (5th Cir.1988) (per curiam). Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5, 96 L.Ed.2d 119 (1987). Once this initial burden is satisfied, the Secretary bears the burden of establishing that the claimant is capable of performing work in the national economy. *Id.*

Following the sequential steps, the ALJ found that while Greenspan had not engaged in substantial gainful activity since June 1987 and suffered from severe allergies and somatoform, she

8

nevertheless could perform her past relevant work as per step four of the analysis. The ALJ determined that Greenspan had the residual functional capacity to work in jobs that did not require lifting more than twenty pounds occasionally and carrying ten pounds frequently. Greenspan also was restricted from work environments that were highly stressful or contained the extremes of dust, fumes, or poor ventilation. The ALJ found that Greenspan's work in the clothing field and as a receptionist was not precluded by these requirements, and, therefore, she was not disabled within the meaning of the Act.

## III.

Greenspan argues that the ALJ erred by given no or little weight to the opinion of her treating physicians. The ALJ accepted the opinion of Mulhauser, who stated that "[t]here is no such thing as Ecologic Illness," and rejected the reports and opinions of her treating physicians, Rhea and his associates. Furthermore, Greenspan believes the ALJ erred by rejecting Ecological/Environmental Illness ("EI") as a recognized disease. She points out that the Program Operation Manual System ("POMS") of the Social Security Administration lists EI as a potential disability. We read these arguments to mean either that the ALJ applied the wrong legal standard in evaluating the weight of the physician's testimony or erred because his conclusion were not based upon substantial evidence.

## A.

We have long held that "ordinarily the opinions, diagnoses,

9

and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir.1985). The treating physician's opinions, however, are far from conclusive. "[T]he ALJ has the sole responsibility for determining the claimant's disability status." *Moore v. Sullivan,* 919 F.2d 901, 905 (5th Cir.1990).

Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony. The good cause exceptions we have recognized include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Scott,* 770 F.2d at 485. In sum, the ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Id.; see also* 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.").

A reading of the ALJ's decision shows that he carefully considered, but ultimately rejected, the treating physicians' conclusions that Greenspan was disabled. While we might not have accorded "no weight" to the opinions of the treating physicians,

the Act empowers the ALJ to analyze the physicians' testimony.

Substantial evidence supports the ALJ's decision to disregard the physicians' conclusions. That basis is enough to survive our review. The record supports the ALJ's determination that the treating physicians' diagnoses were based upon dubious medical techniques and were conclusory. The doctors' evidence also was contradicted by both itself and outside medical evidence.

Few recognized medical techniques were used by the doctors. Feldman's treatment notes spanning a period of three years reveal that he performed no clinical testing other than taking Greenspan's blood pressure and performing controversial "provocative-neutralization tests."[2] Feldman also did not observe any of the numerous symptoms with which Greenspan claimed to be plagued; all "evidence" of these complaints was by history.

Rhea's records consist mainly of handwritten lists of Greenspan's subjective responses to various substances. Testing was also done by "Iriscorder," a machine that allegedly measures changes in the pupils of the eye in response to the body's exposure to substances. Like Feldman, he performed "provocative-neutralization tests." Rhea and Smiley, however, admitted that this testing had not produced reliable results.

---

[2]This controversial technique consists of exposing a patient to a dose of a chemical, food extract, or allergen either by sublingual drop or subcutaneous or intercutaneous injection. Any "symptoms" are then "neutralized" by applying a lower dose of the same substance. POMS § 24515.065. The POMS states that "[t]he results are based solely on the subjected report of symptoms by the patient." *Id.* Greenspan disputes this, arguing that measurement may also be made by the "wheals" caused by the injection.

11

Based upon the minimal nature of testing done by these physicians, the ALJ's determination that their opinion on Greenspan's disability was conclusory is supported by the record. *Cf.* 20 C.F.R. § 1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly signs and laboratory findings, the more weight we will give that opinion.").

The record supports the ALJ's finding that the doctors' records and recommendations were contradictory. While Feldman diagnosed "ecological illness and multiple allergies," which allegedly could result in a host of severe physical problems, his only prescriptions were organic foods, bottled water, filtered air conditioning, and the shots from the "provocative-neutralization tests." Rhea admitted that Greenspan could commute up to an hour to work, but there was no safe work environment to which she could commute. Most damning was Rhea's testimony that "there was no occupation safe enough for the claimant to work in," while, at that time, Greenspan was employed, working at a hospital on a full-time basis.[3]

Numerous outside opinions and testing contradicted the opinions of the treating physicians. The other physicians and medical experts who examined Greenspan or her records found little or no physical evidence of her many complaints; most subscribed to

_____

[3]Greenspan's behavior and testimony also contradicted the doctor's conclusions. The most obvious contradiction occurred at a hearing before the ALJ, where Greenspan appeared wearing make-up and heavy perfume. The ALJ also noted that Greenspan testified that she is still able to perform the routine tasks necessary to maintain her household, and she was researching and writing a handbook on "environmental illness."

the theory that mental rather than physical aliments were at the bottom of her problems.

Greenspan's original treating physician, Cohen, noted that her physical condition was normal, and emotional factors contributed to her complaints. Elizabeth Blake, Greenspan's treating psychology counselor from 1984 to 1986, reported that Greenspan suffered from somatization, dysthymic disorder, histrionic personality, and multiple allergies. Dr. Norman Gaylis found no physical explanation for the complaints but suspected the cause was psychosomatic.

Azen found no objective evidence of the many symptoms of which Greenspan complained but did observe Greenspan's dermographism. This finding, which Lumry later seconded, cast in doubt the accuracy of any "provocative-neutralization tests."

Hospital records from 1985 through 1987 do not reveal any abnormal test results, and Greenspan was discharged from Jackson Memorial Hospital with a diagnosis of histrionic personality and mildly elevated blood pressure. Russel Mitchell, a clinical psychologist, diagnosed atypical somatoform disorder and histrionic personality. Many other medical professions testified in a like fashion.

In sum, a substantial medical record has been created in this application, and it supports the ALJ's decision to disregard the opinions of Feldman, Rhea, and Smiley. The power to judge and weigh evidence includes the power to disregard, and we must uphold that determination if supported by substantial evidence.

13

B.

Greenspan's argument that the ALJ erred in not recognizing "ecological illness" is misplaced. The relevant medical and scientific communities eventually will determine whether and how to recognize "ecological illness." Greenspan's burden here, however, was to prove that she was disabled within the meaning of the Act. That requirement means that she must show a "medically determinable" impairment. 42 U.S.C. § 423(d)(1)(A). Such an impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3); *see also* 20 C.F.R. § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."). Finally, the law requires a showing that the claimant is unable "to engage in any substantial gainful activity." 42 U.S.C. § 423(d)(1)(A).

We recognize that because "ecological illness" is not accepted widely, and no "yes or no" test apparently exists, direct proof of illness and, hence, disability is hard to produce. Proper circumstantial evidence, however, would be enough to prove disability. Such evidence, under the regulations, includes "signs," anatomical, physiological, or psychological abnormalities that can be observed, 20 C.F.R. § 404.1528(b), and "laboratory findings," anatomical, physiological, or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques, *id.* § 404.1528(c).

14

Indeed, POMS states that

> in evaluating claims based on environmental illness, all the claimant's symptoms, signs, and laboratory findings must be considered to determine if there is a medically determinable impairment and the impact of any impairment on the claimant's ability to work. This evaluation should be made on an individual case-by-case basis to determine if the impairment prevents substantial gainful activity.

POMS § 24515.065. While we agree with the Secretary that the POMS is not binding law, because it is an unpublished policy statement, *cf. Schweiker v. Hansen,* 450 U.S. 785, 789-90, 101 S.Ct. 1468, 1471-72, 67 L.Ed.2d 685 (1981), we would read nothing more into this statement than that already required by law. A case-by-case, factual inquiry will consider proper circumstantial evidence of disability.

Here, Greenspan has provided little direct or indirect proof of EI beyond her subjective complaints. This task should not have been impossible, as Greenspan alleged numerous symptoms that are observable and testable. The record supports the ALJ's conclusion that Greenspan's testimony was exaggerated.

IV.

Finally, we must reject Greenspan's appeal, because she has not verified these symptoms and their *severity* in a way the law recognizes. Contrary to the tenor of Greenspan's arguments on appeal, the ALJ did find that she was impaired. He did not conclude, however, that her impairment precluded her from continuing to work successfully in the occupations she had held previously.

The ALJ considered the credible testimony of the consulting

15

physicians on Greenspan's physical and mental condition. He heard testimony from Greenspan on her daily activities. He had heard the testimony of a vocational expert. Greenspan, moreover, bore the burden of showing that she could not do her past relevant work. Here, substantial evidence supports the ALJ's conclusion that Greenspan successfully could perform her past relevant work.

Greenspan's last minute showing that she might suffer from nitral valve prolapse or chronic fatigue syndrome does not overcome this finding. The record shows the ALJ considered and weighed the extent of Greenspan's disability. This new evidence on the potential cause of Greenspan's disability does not mandate a finding of further functional limitations beyond those considered by the ALJ.

We do note that Greenspan's recent unsuccessful efforts to hold jobs for extended periods cast some doubt on her fitness to work. *See Singletary v. Bowen,* 798 F.2d 818, 822 (5th Cir.1986) (holding the record did not support finding that mentally impaired claimant was capable of *holding* a job). This doubt, however, does not create a basis to overturn the ALJ's determination.

The evidence on Greenspan's past work experience cuts both ways. It shows she was able to work when her treating physicians claimed no job existed that she could do. Her progression through the jobs suggests that her mental and physical impairments did limit her ability to be a successful wage earner. Our job here is not to weigh this evidence; that task is for the ALJ. As long as there is substantial evidence in the record as a whole supporting

16

the ALJ's determination, as there is here, we must uphold that decision.

AFFIRMED.