Diane D. **MONROE**, Plaintiff,

v.

**Jo Anne B. BARNHART**, Commissioner of the Social Security Administration, Defendant.

No. CIV.A. H041436.

United States District Court, S.D. Texas, Houston Division.

March 24, 2005.

Victor N. Makris, Attorney at Law, Bellaire, for Diane D. Monroe, Plaintiff.

Joseph B. Liken, OGC Social Sec. Admin., Dallas, for Jo Anne B. Barnhart Commissioner of the Social Security Administration, Defendant.

## MEMORANDUM AND ORDER

HOYT, District Judge.

On March 3, 2005, Magistrate Judge Calvin Botley issued a Memorandum and Recommendation [Doc. # 19], suggesting that Plaintiff Diane D. Monroe's ("Monroe") Motion for Summary Judgment [Doc. # 13] be granted, that Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), Motion for Summary Judgment [Doc. # 16] be denied, and that the case be reversed and remanded, pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to develop a proper analysis under the medical improvement standard as set forth in 20 C.F.R. § 404.1594(f).

This Court has reviewed the Memorandum and Recommendation, noting that no objections have been filed, and the pleadings filed by the parties. It is, therefore,

**ORDERED** that the Memorandum and Recommendation [Doc. # 19] is **ADOPTED** as this Court's Memorandum and Order. It is further

**ORDERED** that Monroe's Motion for Summary Judgment [Doc. # 13] is **GRANTED.** It is further

*ORDERED* that the Commissioner's Motion for Summary Judgment [Doc. # 16] is **DENIED.** It is further

**ORDERED** that the case is **RE-VERSED** and **REMANDED,** pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to

develop a proper analysis under the medical improvement standard as set forth in 20 C.F.R. § 404.1594(f). It is finally

**ORDERED** that this matter be **DISMISSED** from the dockets of this Court.

## MEMORANDUM AND RECOMMENDATION

BOTLEY, United States Magistrate Judge.

Pending before the court are Plaintiff Diane D. Monroe ("Monroe") and Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration (the "Commissioner"), cross-motions for summary judgment. Monroe appeals the determination of an Administrative Law Judge ("the ALJ") that she is not entitled to receive disability insurance benefits under Title II of the Social Security Act. *See* 42 U.S.C. §§ 416, 423. Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is recommended that Monroe's Motion for Summary Judgment (Docket Entry No. 13) be granted, the Commissioner's Motion for Summary Judgment (Docket Entry No. 16) be denied, the ALJ's decision denying benefits be reversed, and the case be remanded pursuant to sentence four to the Social Security Administration ("SSA") for further proceedings.

## I. *Background*

Monroe filed an application for disability insurance benefits with the SSA on April 14, 1998,[1] alleging disability beginning on October 26, 1993, as a result of chronic and severe pain, muscle spasms, fibromyalgia,[2] a neck and back sprain, a severe cervical strain, a thoracic strain, a post concussion disorder,[3] major depression,[4] a post-traumatic stress disorder,[5] and an attention-deficit/hyperactivity disorder.[6] (R. 17,

---

1. Monroe had previously filed for disability benefits on September 22, 1994, and the claim was denied initially on January 5, 1995, and again on reconsideration on May 10, 1995. (R. 18, 42–45, 46–49, 52–55). Monroe filed the current application on April 14, 1998, which was within four years from the date of the prior initial determination. (R. 18, 234–236)

2. "Fibromyalgia" is pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 673 (29th ed. 2000).

3. "Postconcussional disorder" or "Postconcussional syndrome" refers to physical and personality changes that sometimes occur after concussion of the brain; they include amnesia, headache, dizziness, tinnitus, irritability, fatigability, sweating, palpitations of the heart, disordered sleep, and difficulty in concentrating. *See* DORLAND'S, supra, at 531, 1764.

4. "Major depressive disorder" denotes a mood disorder characterized by the occurrence of one or more major depressive episodes and the absence of any history or manic, mixed, or hypomanic episodes. *See* DORLAND'S, supra, at 530.

5. "Post-traumatic stress disorder" is an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating. The onset of symptoms may be delayed for months to years after the event. *See* DORLAND'S, supra, at 531.

6. "Attention-deficit/hyperactivity disorder" refers to a childhood mental disorder characterized by inattention (such as distractibility, forgetfulness, not finishing tasks, and not appearing to listen), by hyperactivity and impulsivity (such as fidgiting and squirming, difficulty in remaining seated, excessive running or climbing, feelings of restlessness, difficulty awaiting one's turn, interrupting others, and excessive talking) or by both types of behavior. The behavior must interfere with academic, social, or work functioning, with impairment existing in at least two settings.

234–236). After being denied benefits initially and on reconsideration, Monroe requested an administrative hearing before an ALJ. (R. 208–222).

A hearing was held on April 14, 1999, in Bellaire, Texas, at which time the ALJ heard testimony from Monroe, Nancy Tarrand, M.D. ("Dr. Tarrand"), a medical expert specializing in psychiatry, and Wallace A. Stanfill ("Stanfill"), a vocational expert ("VE"). (R. 17, 227–232, 610–657). In a partially favorable decision dated July 12, 1999, the ALJ granted in part and denied in part Monroe's application for benefits. (R. 14–39). The ALJ found that Monroe was under a disability as defined in the SSA from October 26, 1993, to May 11, 1998, but that her disability ceased on May 11, 1998. (R. 29–30). Thus, the ALJ determined that Monroe's entitlement to a period of disability and disability insurance benefits ended with the close of July 1998, the second month following the month in which disability ceased. (R. 30). On August 2, 1999, Monroe appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 12). The Appeals Council, on February 6, 2004, denied Monroe's request to review the ALJ's determination. (R. 6–9). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Monroe filed the instant action on April 8, 2004, seeking judicial review of the Commissioner's denial of her claim of benefits. *See* Docket Entry No. 1.

### A. *Statutory Bases for Benefits*

■ Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The disability insurance

Onset is before age seven, but it can persist

program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled,* regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. See 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger,* 516 F.2d 1005, 1007 n. 1 (5th Cir.1975); *see also Perkins v. Chater,* 107 F.3d 1290, 1295 (7th Cir.1997). For purposes of Title II disability benefits, Monroe was insured for benefits through the date of the ALJ's decision—*i.e.,* July 12, 1999. (R. 17–19). Consequently, to be eligible for disability benefits, Monroe must prove that she was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act. See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a). Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

### B. *Standard of Review*

#### 1. *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for sum-

into adulthood. *See* DORLAND'S, supra, at 528.

mary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.,* 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo. See Merritt–Campbell, Inc. v. RxP Prods., Inc.,* 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.,* 199 F.3d 796, 798 (5th Cir.2000).

### 2. *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir.2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Pe-*

*rales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson,* 309 F.3d at 272; *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir.1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart,* 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo,* or substitute its judgment for that of the Commissioner. *See Masterson,* 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

### C. *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vo-

cational factors. *See* 20 C.F.R. § 404.1520(d).

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir.2000); *accord Boyd,* 239 F.3d at 704–05. The claimant has the burden to prove disability under the first four steps. *See Myers,* 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson,* 309 F.3d at 272; *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd,* 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

▮▮▮ The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See*

*Newton,* 209 F.3d at 452; *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990); *Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir.1988); *Cook v. Heckler,* 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel,* 238 F.3d 592, 594 (5th Cir.2001); *accord Newton,* 209 F.3d at 452; *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999); *Selders,* 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton,* 209 F.3d at 452–53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler,* 707 F.2d 162, 165 (5th Cir.1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ....' " *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir.1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant met the disability insured status requirements of the Act on October 26, 1993, the date she stated she became unable to work, and continued to meed them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date.

3. The medical evidence establishes that claimant has a depressive disorder,[7] a somatoform disorder,[8] and a personality disorder,[9] but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony was not fully credible or consistent with the record considered as a whole.

*   *   *   *   *   *

8. The claimant has been unable to perform her past relevant work as a rural mail carrier and waitress.

(R. 29). As to the fifth step, the ALJ concluded:

5. From October 26, 1993, to May 11, 1998, the claimant did not have the residual functional capacity to perform work at any exertional level on a sustained basis due to frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. As of May 11, 1998, she regained the capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, sit, stand, and walk 6 hours each in an 8 hour workday, and occasionally bend and stoop, but no overhead lifting could be performed. She could alternately sit and stand at 30 minute intervals. She was restricted to a low stress, structured work environment performing tasks involving simple repetitive instructions (with a recorded verbal IQ of 107, a performance IQ of 84, and a full scale IQ of 96).

6. Medical improvement related to the ability to work is established as of May 11, 1998.

*   *   *   *   *   *

8. As of the alleged onset date the claimant was 44 years of age, defined as a younger individual. As of January 1999, she attained age 50, defined as an individual closely approaching advanced age.

9. The claimant has a high school and above education.

10. The claimant does not have skills that readily transfer to jobs within her residual functional capacity.

---

7. "Depressive disorder" denotes mood disorders in which depression is unaccompanied by manic or hypomanic episodes; *e.g.*, major depressive disorder and dysthymic disorder. *See* DORLAND's, supra, at 529.

8. "Somatoform disorder" refers to mental disorders characterized by symptoms suggesting a general medical condition but neither fully explained by a general medical condition, the direct effects of a psychoactive substance, or another mental disorder not under voluntary control. *See* DORLAND's, supra, at 532.

9. "Personality disorder" describes a category of mental disorders characterized enduring, inflexible, and maladaptive personality traits that deviate markedly from cultural expectations, are self-perpetuating, pervade a broad range of situations, and either generate subjective distress or result in significant impairments in social, occupational, or other functioning. Onset is by adolescence or early adulthood. *See* DORLAND's, supra, at 531.

11. Based on the testimony of the vocational expert, and using Rule 202.21 of Appendix 2, Subpart P, Regulations No. 4 as a framework for decision making, jobs which the claimant was capable of performing from October 26, 1993, to May 11, 1998, did not exist in significant numbers in the national economy.

12. Based on the testimony of the vocational expert, and using Rules 202.14 and 202.21, Appendix 2, Subpart P, Regulations No. 4, as a framework for decision making, jobs which the claimant was capable of performing as of May 11, 1998, existed in significant numbers in the national economy. Examples of such jobs included small products assembler, electronics worker, production solderer, and shipping and receiving weigher.

13. The claimant was under a "disability," as defined in the Social Security Act, from October 26, 1993, to May 11, 1998, but not thereafter.

14. The prior determination dated January 2, 1995, is reopened and revised.

(R. 29–30).

■ This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d at 619; *Newton,* 209 F.3d at 452; *Greenspan,* 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Monroe's claim for disability benefits is supported by substantial evi-

dence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir.1995); *Wren v. Sullivan,* 925 F.2d 123, 126 (5th Cir.1991) (citing *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton,* 209 F.3d at 452; *Brown,* 192 F.3d at 496; *Martinez,* 64 F.3d at 174; *Selders,* 914 F.2d at 617.

### D. *Issues Presented*

■ Monroe contends that substantial evidence does not support the findings of the ALJ. Specifically, Monroe argues that the ALJ failed to provide comparative findings to Monroe's physical and mental condition to demonstrate "medical improvement" required to support the closed period of disability. *See* Docket Entry No. 14, at 5–11; Docket Entry No. 18. Additionally, Monroe maintains that the ALJ failed to conduct a proper assessment of Monroe's physical residual functional capacity. *See id.* The Commissioner contends that the ALJ's findings are supported by substantial evidence. *See* Docket Entry No. 17.

### E. *"Medical Improvement"*

"In the Benefits Review Act of 1984, 42 U.S.C. § 423(f), Congress established specific standards for the termination of disability benefits." *Griego v. Sullivan,* 940 F.2d 942, 943 (5th Cir.1991). An eight-part sequential evaluation process is used in termination reviews.[10] *See* 20 C.F.R.

---

**10.** The medical improvement standard, as defined by 20 C.F.R. § 404.1594(b)(1), applies in "closed period" cases such as this one, in

which a plaintiff is determined to have been disabled for a finite period of time and there-

§ 404.1594(f)(1)-(8); *see also Griego,* 940 F.2d at 944 n. 1. The Commissioner bears the burden of showing medical improvement by establishing that the claimant's medical condition has improved, the improvement is related to the claimant's ability to work, and the claimant is currently able to engage in substantial gainful activity. *See id.* at 943–44. The regulations define medical improvement as:

> [a]ny decrease in the medical severity of [the] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the] impairment(s).

20 C.F.R. § 404.1594(b)(1).

The ALJ must first compare the medical severity of the current impairment(s) to the severity of the impairment(s) present at the time of the most favorable medical decision finding the claimant disabled. *See* 20 C.F.R. § 404.1594(b)(7). Then, in order to determine that medical improvement is related to ability to work, the ALJ must reassess a claimant's residual functional capacity (RFC) based on the current severity of the impairment(s) present at claimant's last favorable medical decision. *See id.* at § 404.1594(c)(2). The ALJ must then compare the new RFC with the RFC before the putative medical improvements. The ALJ may find medical improvement related to an ability to do work only if an increase in the current RFC is based on objective medical evidence. *See id.*

In the case at bar, the ALJ awarded Monroe a closed period of benefits (*i.e.,* October 26.1993, to May 11, 1998) finding as follows:

after regained the ability to work. *See Shepherd v. Apfel,* 184 F.3d 1196, 1198 (10th Cir.

The undersigned Judge finds that the claimant's subjective symptoms, including pain, were generally credible with respect to the period of time from the alleged onset date to May 11, 1998. However, as of May 11, 1998, her symptoms, including pain, were of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein. Considering the claimant's history and treatment, the objective clinical findings, the claimant's subjective complaints, the observations and comments of her treating sources, the assessment of the State Agency reviewing physician, the testimony of the medical expert, and all of the evidence of record considered as a whole, it is concluded that from October 26, 1993, to May 11, 1998, she did not have the residual functional capacity to perform work at any exertional level on a sustained basis due to frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. As of May 11, 1998, she regained the capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, sit, stand, and walk 6 hours each in an 8 hour workday, and occasionally bend and stoop, but no overhead lifting could be performed. She could alternately sit and stand at 30 minute intervals. She was restricted to low stress, structured work environment performing tasks involving simple repetitive instructions (with a recorded verbal IQ of 107, a performance IQ of 84, and a full scale IQ of 96). Medical improvement related to the ability to work is established as of May 11, 1998 (20 C.F.R. § 404.1594).

1999).

(R. 25–26). The ALJ also attached to his decision two Psychiatric Review Technique Forms based on Listings 12.04 Affective Disorders (Depressive syndrome), 12.07 Somatoform Disorders (Persistent nonorganic disturbance of sensation), and 12.08 Personality Disorders (Pathologically inappropriate suspiciousness or hostility)—one form covered October 26, 1993, to May 11, 1998, and the other form applied from May 11, 1998, to present. (R. 31–35, 36–39). The ALJ's boilerplate language is insufficient to satisfy the medical improvement standard set forth in 20 C.F.R. § 404.1594(f).

As a threshold matter, the ALJ did not explain either in her decision or in the appended forms how she promulgated Monroe's physical residual functional capacity. The list of Monroe's "severe" impairments related exclusively to mental impairments.[11] (R. 19). Although the Commissioner argues that the June 1998 assessment (R. 299–302) by Dr. Bhupat G. Vachhani, M.D. ("Dr. Vachhani"), a doctor specializing in internal medicine, "substantially conforms to the ALJ's finding," and that it is "evident" that the ALJ relied on the same when assessing Monroe's physical functional capacity, the ALJ failed to provide a baseline or comparison point RFC and a "current" RFC. The ALJ's failure to tie her RFC assessment to any particular findings and to any specific impairment is in direct contravention to 20 C.F.R. § 404.1594(f).

Additionally, contrary to the requirements of the regulation, the ALJ failed to provide adequate reasons for her determination that Monroe's mental impairments met Listings 12.04, 12.07, and 12.08 before, but not after, the "medical improvement" date of May 11, 1998. In an attempt to show such improvement, the ALJ made references to apparent changes in Monroe's psychodynamics, observing that, in May 1998, Monroe, having taken herself off medication, "acknowledged that[,] overall[,] her symptoms had improved." (R. 20). The ALJ further referenced that in July 1998, Monroe "acknowledged that she had gotten a very good response to Zoloft and was feeling less depressed and less explosive." (R. 20). Additionally, the ALJ observed a psychology note from July 1998 "indicate[d] that her mood was better[,]" she was "having better alertness," and she had improved " 'quite a bit.' " (R. 20). While these observations suggest a measure of improvement of an earlier state, they do not provide the degree of improvement, the degree of the severity of the condition following such improvement, or the extent to which the improvement related to Monroe's ability to function in or out of the workplace. In essence, the ALJ did not identify a baseline functioning level as required by 20 C.F.R. § 404.1594(f), but, instead, merely reported some descriptions of relative changes without any explanation of severity/functionality either before or after the change.

Moreover, an examination of the medical report of May 11, 1998 (*i.e.*, the date of alleged medical improvement), raises serious concerns as to Monroe's alleged mental medical improvement. For example, on May 11, 1998, Monroe was assessed by The Pain Care Center for evaluation and treatment of chronic pain of her lower back and neck and posttraumatic stress syndrome. (R. 330, 411). As part of the evaluation process, Laurie Baldwin, Ph.D. ("Dr. Baldwin") conducted an initial psychologic assessment of Monroe. (R. 419–423). In the context of "medical history," Monroe related to Dr. Baldwin that in 1993 she had a problem with heavy menstrual bleeding and the doctors thought she was delusional at the time but that,

---

**11.** The ALJ's decision as to medical improvement was tied only to Monroe having demonstrated such improvement in her nonphysical or mental conditions.

subsequently, a doctor discovered a tumor on her cervix and the tumor "looked like a penis coming out of my vagina." (R. 420). Monroe also reported to Dr. Baldwin that her late husband had been "smashed by an elephant" in 1991 and that, although his doctors stated the husband's subsequent heart and lung problems, which caused his death in December 1997, were completely unrelated to the incident, Monroe conducted extensive research and knows for a fact that the heart and lung problems were the result of the elephant accident.[12] (R. 420). Monroe reported that the doctors who treated her husband lied to cover up for the alleged mistake made by her husband's treating physician. Monroe further advised Dr. Baldwin that she had a problem with excessive gum tissue in her mouth, causing her gums to enlarge to the point that they were practically covering her teeth. (R. 420). Monroe reportedly treated herself for this condition by initiating her own therapy which involved stretching and acupressure. (R. 420). Monroe claimed that by applying pressure points on her face, she reduced the size of her gums. (R. 420). Monroe described this process as her teeth getting larger. (R. 420).

Under "social history," Monroe reported to Dr. Baldwin that when she was on medication she began having flashbacks and recovering memories that disturbed her. (R. 421). Monroe recalled being a twin and that she witnessed her grandfather murdering her grandmother's lover. (R. 421). Monroe, who's father was said to have died of an aneurysm, reported to Dr. Baldwin that she now believes her brother murdered him. (R. 421). Additionally, Monroe reported that she believed that she was her aunt's child, rather than her mother's child, because she always felt different from other family members. (R. 421).

On May 11, 1998, Dr. Baldwin's impression was that Monroe suffered from major depressive disorder and exhibited some mild symptoms of paranoia. (R. 423). Dr. Baldwin recommended that Monroe be further evaluated for depression upon entering the pain care management program. (R. 423). Dr. Baldwin further recommended that Monroe be "monitored by a psychologist on a daily basis to make sure that she is not experiencing further cognitive deterioration." (R. 423). Monroe was accepted as a viable candidate for the program, consisting of twenty treatment days 8:30 a.m. to 4:30 p.m. each day. (R. 412).

While the foregoing assertions, recollections, and recommendations made on May 11, 1998, raise serious doubts as to Monroe's mental stability, much less her ability to function on a job, subsequent psychotherapy notes indicate that Monroe suffered from mental deficiencies. For example, on June 8, 1998, Dr. Baldwin noted that Monroe did not appear to be having problems with anxiety at that time; however, Monroe was experiencing significant problems with depression. (R. 400). Dr. Baldwin recommended that Monroe be evaluated by a psychiatrist for antidepressant medication and participate in a psychotherapeutic group environment. (R. 400–401). Additionally, staffing minutes made on June 17, 1998, reveal that the "[t]eam feels patient is experiencing significant depression and can benefit from medication management and individual psychotherapy and are requesting 6 sessions, 2xs a week." (R. 417). On June 19 and 23, 1998, Stanton I. Moldovan, M.D. ("Dr. Moldovan"), a neurologist, examined Monroe and found mild depression; Dr. Moldovan prescribed Zoloft to Monroe. (R. 374–375).

On June 26, 1998, when Dr. Vachhani examined Monroe for back pain and fibro-

---

12. Monroe's late husband was an elephant trainer at the Houston Zoo. (R. 420).

myalgia for Texas Rehabilitation Commission, he reported that Monroe stated she suffered from depression and had become even more depressed since her husband's death. (R. 299). Dr. Vachhani further noted that Monroe cried during the examination, felt lonely, and was unable to sleep well. (R. 299). Dr. Vachhani reported that Monroe had an appointment to see a psychiatrist. (R. 299, 301). On June 29, 1998, Monroe met with Kirk L. Coverstone, Ph.D. ("Dr. Coverstone") for individual psychotherapy to address the question of suicide potential, as earlier that day, Monroe had engaged in some suicidal ideation in interacting with other staff members at the pain management center. (R. 370). Although Dr. Coverstone did not find her to be a suicide risk at that time, he recommended ongoing individual psychotherapy to assess Monroe. (R. 370). On July 2, 1998, Dr. Moldovan noted that Monroe showed signs of anxiety and that she had reportedly been depressed during morning programs and observed to be labile and impulsive. (R. 368). He recommended to continue treatment with Zoloft. (R. 369).

On July 8, 1998, her last day in the pain management program, Monroe acknowledged in group therapy that she had gotten a very good response to her Zoloft and was feeling less depressed and explosive; however, she reportedly spoke at length in a group therapy session about ongoing difficulties getting reoriented to the workplace. (R. 363). By the end of the session, Monroe reportedly seemed "somewhat less agitated and more assured." (R. 363). Monroe's psychology discharge plan indicated that "if patient returns to work," she should continue with "individual therapy one time [per] week

for 2–3 months to help with transition back to work." (R. 362). It was further recommended that she continue with medication for depression, use relaxation tapes at home, and use cognitive refutation techniques at home. (R. 362).

On July 10, 1998, Theodore Pearlman, M.D. ("Dr. Pearlman") conducted a psychiatric examination of Monroe, at which time he observed "no physical distress during the course of the interview." (R. 305). According to Dr. Pearlman, the painful muscle spasms that Monroe described were not matched by objective medical findings. (R. 306). Dr. Pearlman further opined that there was nothing in Monroe's history indicating an inability to function psychologically, socially and occupationally in her life prior to her automobile injury in 1990. (R. 306). Dr. Pearlman believed that the soft tissue injuries allegedly sustained by Monroe in the accident did not account for why over eight years later she was still experiencing multiple symptoms. (R. 306–307). Dr. Pearlman acknowledged that Monroe "might have been depressed" when she was admitted to Charter Hospital in 1993, but, according to Dr. Pearlman, there was no current evidence of depressive syndrome or any other mental disorder. (R. 307). Based on his one time examination, Dr. Pearlman diagnosed Monroe with malingering. (R. 307).

On October 21, 1998, Kevin G. Smith, Ph.D. ("Dr. Smith") conducted a psychological evaluation of Monroe. (R. 598–601). Dr. Smith's impression was that Monroe had post traumatic stress disorder, major depression, and a cognitive disorder due to closed head injury. (R. 600–601). He also evaluated Monroe with a Global Assessment of Functioning ("GAF") of 50.[13] (R. 601). Dr. Smith recom-

13. A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL

DISORDERS ("DSM–IV–TR") 32 (4th ed. 2000). The reporting of overall functioning is done by using the GAF Scale, which is divided into

mended individual psychotherapy treatment for Monroe. (R. 601). Between October 1998 and February 1999, Monroe had seven (7) individual psychotherapy sessions and seven (7) biofeedback sessions. (R. 564, 565, 571, 572, 576, 582, 583, 587, 591, 597). In order to document Monroe's cognitive functional level, Dr. Smith performed a second neurological evaluation in March 1999. (R. 544–548). At that time, he evaluated Monroe with a GAF of 55,[14] which was slightly improved. (R. 548). Based on the results of the neurocognitive evaluation, Dr. Smith found the following:

> ...the neurocognitive evaluation provides further evidence that the patient continues to suffer from cognitive impairment sufficiently severe enough to compromise her ability to benefit from job retraining. It is also my opinion, given the severity level of her deficits, that she would have difficulty returning to gainful employment. The results of the testing suggest that the patient has severe problems with attention and concentration, verbal and nonverbal memory, visual spacial and constructional skills, a definite decline in intellectual skills for certain intellectual domains, and persistent but improved anxiety-related symptoms, consistent with post traumatic stress disorder. Given these findings, the patient could learn compensatory mechanisms to cope with her cognitive deficits, but this may interfere with her inability to return to work. During future treatments, the clinician will attempt to cover strategies and methods for compensatory strategies for cognitive impairment and will further

work with the patient to be aware of the nature of her deficits and learn to adjust with them.

(R. 548).

Dr. Smith continued to treat Monroe through April 1999, when her insurance authorization for treatment expired. (R. 551, 558, 559). On April 1, 1999, Dr. Smith reported that results from neuropsychological testing revealed "severe cognitive deficits in the following domains due to her work-related injury, including deficits in attention/concentration, verbal and nonverbal memory, visual-spatial-constructional skills, executive abilities, and personality and mood changes." (R. 551). Dr. Smith opined that Monroe "very clearly needs additional individual therapy." (R. 549, 551). Dr. Smith reported that he planned to request from Monroe's insurance that she be permitted to participate in twelve (12) additional psychotherapy sessions. (R. 549).

Despite Monroe beginning participation in an intensive pain management program on May 11, 1998, and numerous references by various doctors over subsequent months (*i.e.*, post-May 11, 1998) to Monroe suffering from significant depression and/or suicidal ideation, the ALJ relied primarily on state doctors for the finding that Monroe had "medically improved" related to her ability to work and was no longer disabled. Although Dr. Smith had treated Monroe for months and, by the ALJ's own admission, had conducted "extensive evaluations," the ALJ rejected Dr. Smith's opinions as unsupported by clinical findings. (R. 22–24). Instead, the ALJ relied largely on the nonexamining expert

---

ten ranges of functioning. The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. A GAF rating of 50 indicates a "serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *See id* at 34.

**14.** A GAF rating of 55 indicates a "moderate" impairment in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers). *See* DSM–IV–TR, *supra*, at 34.

opinion of Dr. Tarrand. (R. 21–23). Notwithstanding, the ALJ failed to provide a mental RFC describing how Monroe's three "severe" mental impairments hindered, facilitated, or left unaffected the performance of psychologically based work-related functions. Neither in her questioning of the medical expert at the hearing nor in her decision did the ALJ make reference to such an assessment. (R. 17–39, 632–653). In sum, as set forth above, the ALJ did not apply the proper medical improvement standard as set forth in 20 C.F.R. § 404.1594(f). Consequently, this case should be remanded for a proper analysis.

### III. *Conclusion*

It is, therefore, **RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket Entry No. 13) be **GRANTED.** Further, it is

**RECOMMENDED** that the Defendant's Motion for Summary Judgment (Docket Entry No. 16) be **DENIED.** Further, it is

**RECOMMENDED** that the case be **REVERSED** and **REMANDED**, pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to develop a proper analysis under the medical improvement standard as set forth in 20 C.F.R. § 404.1594(f). Further, it is

**RECOMMENDED** that this matter be **DISMISSED** from the dockets of this Court.

The Clerk of the Court shall file this Memorandum and Recommendation and provide the parties with a true copy. The parties shall have ten (10) days from receipt to file specific, written objections to the Memorandum and Recommendation. *See* FED. R. CIV. P. 72. Absent plain error, the failure to file objections bars an attack on the factual findings, as well as the legal conclusions, on appeal. The original of

any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208–1010. Copies of the objections must be mailed to the opposing party and to the chambers of the magistrate judge, P.O. Box 61205, Houston, Texas 77208–0070.