**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. Application. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 12, 2006
Decided April 10, 2007

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 06-1476

| | |
|---|---|
| ALLEN ADKINS, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Southern District of |
| | Indiana, Indianapolis, Division. |
| *v.* | |
| | No. 1:04-cv-2125-LJM-WTL |
| MICHAEL J. ASTRUE,[*] | |
| Commissioner of Social Security, | Larry J. McKinney, |
| *Defendant-Appellee.* | *Chief Judge.* |

**O R D E R**

In 2001, Allen Adkins applied for disability insurance benefits and
supplemental security income under the Social Security Act, *see* 42 U.S.C. §§ 416(I),
423, 1382(a)(3)(A), claiming disability due to mental retardation, breathing
problems, and chronic pain. Adkins's claim was denied at the initial levels of

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c), we have substituted
Michael J. Astrue for Jo Anne B. Barnhart, who was originally the named
Commissioner of Social Security at the time of the complaint and oral argument in
this matter.

administrative review and on reconsideration.  Adkins then requested a hearing before an administrative law judge (ALJ).  The ALJ found that Adkins was not disabled and was capable of working within certain limitations.  On appeal, Adkins raises only the issue of disability based on mental retardation.  The record contains substantial evidence in support of the finding that Adkins failed to qualify for disability based upon mental retardation under Listing 12.05C, and furthermore because we are convinced that Adkins has received all the process he is entitled to, we affirm.

Adkins was born on December 31, 1956.  He completed the eighth grade in special education classes.  He was gainfully employed performing the duties of a general laborer, including assembling waterbeds, servicing trucks, carrying furniture, working as a security guard, driving a delivery truck, as well as repairing machines in a factory.  In December of 1998, at forty-one years of age, Adkins was injured at work when a 400-pound drum fell on his chest, fracturing his ribs and puncturing his lung, necessitating surgical intervention including the removal of a portion of one of his lungs in the following March of 1999.  He has remained unemployed since that time.

The next month, in April of 1999, Adkins consulted with a Dr. Dennis Zawadski, a pulmonary specialist, who after examination determined that Adkins smoked and suffered from chronic obstructive pulmonary disease (COPD), bronchitis, right pleural effusion with fibrothorax,[1] reduced forced vital capacity, and dyspnea (shortness of breath) on exertion.  Dr. Zawadski prescribed Celebrex for pain relief.  The following September, Dr. Michael G. Koelsch, Adkins's thoracic surgeon, released Adkins to return to work, advising him against working in dusty environments or other areas with strong chemical smells that might affect his lungs and interfere with his breathing.

In 2000, Dr. Paucen N. Mathur, another pulmonary specialist, concluded that Adkins was suffering from early emphysema, and that his fibrothorax, initially diagnosed in 1999, had healed fairly well.  Later that year Adkins consulted with another physician, Dr. Scott B. Taylor, board certified in physical medicine and rehabilitation, who diagnosed degenerative disk disease in Adkins's back and recommended physical therapy.  Dr. Taylor determined that Adkins struggled with

---

[1] A condition characterized by adhesion of the two layers of pleura, the lung being covered by a thick layer of nonexpansible fibrous tissue; often a consequence of traumatic hemothorax or of effusion.  *See* Dorland's Illustrated Medical Dictionary 629 (28th ed. 1994).

heavy lifting, but would be able to perform sedentary work, such as truck driving, and employment that required no continuous or repetitive lifting.

In 2001, Adkins was examined by Dr. Anton N. Kojouharov, a general practitioner, at the behest of the state disability determination service. Dr. Kojouharov found that Adkins's pain increased with bending or lifting and recommended a lifting restriction of fifteen pounds. He also noted cervical spine pain, lower back pain, COPD, and nicotine addiction. Dr. A. Landwehr, a state agency medical consultant, concluded that Adkins could perform medium-level work activities, including lifting twenty-five to fifty pounds and standing, sitting, and walking for as much as six hours in a workday.

In 2002, Dr. Amy M. Carter, a primary care physician, saw Adkins and found that he was suffering from respiratory problems, lower back pain, arthritis, and depression. She prescribed Celexa to treat anxiety and depression. In April 2003, Carter opined in a letter regarding Adkins's disability claim that Adkins had "very few occupational options" due to his various medical problems as well as his very limited education. In November 2003, Dr. Carter examined Adkins again and concluded that he was "permanently unable to work due to chronic pain and dyspnea s/p lobectomy" (difficult or labored breathing after surgical removal of a portion of a lung).

At a hearing in October 2002, testimony was presented by Dr. Mark O. Farber, a medical expert in internal medicine and lung diseases, concerning Adkins's damaged lungs, stemming in part from his 1998 accident, and degenerative joint disease, as well as concerns about his mental ability. Dr. Farber, appearing at the ALJ's request, testified that Adkins was suffering from restrictive lung disease and COPD associated with long-term smoking. Dr. Farber also stated that Adkins had degenerative joint disease and a history of anxiety and depression, as reported to his primary care physicians. Dr. Farber also determined that Adkins did not meet the criteria for any of the listed impairments. Dr. Farber opined that Adkins would be able to lift twenty pounds occasionally, ten pounds frequently, and work about six hours a day with periodic breaks while alternating sitting and standing. Adkins testified that he attended special education classes in school, even though his IQ had never been tested. At the request of Adkins's attorney, the ALJ ordered that a psychological evaluation combined with intelligence testing be conducted and appointed the necessary experts.

Thereafter, the two court-appointed psychologists, Dr. Ceola Berry and Dr. Susan Spencer, examined Adkins and concluded that Adkins had problems with cognition and mental health. Dr. Berry diagnosed dysthymic depression with

anxiety features and nicotine dependency, and she rated Adkins poorly in his ability to work. Dr. Spencer determined that Adkins's Verbal IQ was sixty-eight, his Performance IQ was seventy, and his Full Scale IQ was sixty-six—all scores falling within the classification of "mildly mentally handicapped." On the other hand, Dr. Spencer failed to classify him as being mentally retarded; instead she reported "No Diagnosis on Axis II," where a diagnosis of mental retardation would ordinarily be expected. She believed that these IQ scores were a "relatively valid representation" of Adkins's intellectual capacity, but also cautioned that the scores might be lower because he was suffering from depression as well as chronic pain. Spencer found that Adkins read at a fifth-grade level, a "level sufficient to read information required in his past line of work." Spencer also administered the Minnesota Multiphasic Personality Inventory (MMPI) and noted that Adkins had "claimed many more psychological symptoms than most patients do," thus suggesting that he might be "exaggerating his symptoms in order to gain attention or services" or may possibly be suffering from "unusually severe psychological problems."

At a supplemental hearing before the ALJ in February 2004, Dr. Jack E. Thomas,[2] an independent, court-appointed psychologist, disagreed with some of the conclusions offered by Drs. Berry and Spencer. Dr. Thomas opined that Adkins's psychological symptoms seemed to be exaggerated and that the indications of severe mental limitations did not comport with evidence in the record of Adkins's usually intact cognitive status. Dr. Thomas stated that the validity scales on Adkins's MMPI suggested a "fake bad, exaggerated profile," meaning Adkins might be exaggerating his symptoms. He also identified internal inconsistencies in Dr. Spencer's report and ultimately rejected the suggestion made by Adkins's attorney that Adkins was mentally retarded and stated that he may possibly suffer from a learning disability. Dr. Thomas opined that the overall data suggested a "less than severe" mental impairment that fell short of meeting or equaling any listed impairment.

In April 2004, in concluding that Adkins was not entitled to benefits, the ALJ used the familiar five-step inquiry. *See* 20 C.F.R. § 404.1520. In the first step the ALJ considers the applicant's present work activity. *See id.* § 404.1520(a)(4)(i). Second, the ALJ weighs the severity of the applicant's impairment. *See id.* § 404.1520(a)(4)(ii). The impairment or combination of impairments must significantly restrict an applicant's physical or mental ability to perform basic work activities or an ALJ should enter a finding of not disabled. *See id.* § 404.1520(c). Third, the ALJ decides whether the impairment or combination of impairments

---

[2] Dr. Thomas did not examine Adkins personally but, after reading the medical reports on file, gave his interpretation of the psychological evidence.

meets or equals an impairment listed within the regulations that are conclusively disabling. *See id.* § 404.1520(a)(4)(iii). If an ALJ is unable to make a disability determination in the first three steps, then the process proceeds to an assessment of the applicant's residual functional capacity (RFC). *See id.* § 404.1520(e). At the fourth step, the ALJ determines whether the RFC prevents the applicant from performing his or her past relevant work. *See id.* § 404.1520(a)(4)(iv). If not, in the fifth and final step the ALJ uses the assessment of RFC to determine if the applicant can make an adjustment to other work based on the applicant's age, education, and work experience. *See id.* § 404.1520(a)(4)(v). In the last step, the burden is on the Commissioner to demonstrate that the applicant is capable of performing other work "in the national economy." *Butera v. Apfel*, 173 F.3d 1049, 1054 (7th Cir. 1999).

The ALJ found that: (1) Adkins had no history of performing substantial employment since his accident and the alleged onset of his disability in March 1999; (2) Adkins had a variety of severe impairments, including COPD, lumbar and cervical disc disease, and a mild cardiac impairment; (3) Adkins did not have an impairment that met or equaled a listed impairment in Appendix 1, Subpart P, Regulations No. 4; (4) Adkins could perform his past work as a sedentary semi-skilled security guard-patroller; and (5) Adkins also could perform similar sedentary light and unskilled occupations such as hand sorting and assembly, as long as he avoided certain environmental conditions that aggravated his breathing problems. The ALJ also found that Adkins's "veracity in general is somewhat suspect."

After the Appeals Council denied Adkins's request for review, Adkins appealed to the district court, arguing that his mental retardation combined with his physical ailments constituted a disability under Listing 12.05C. The district court affirmed the denial of benefits, finding that Adkins did not suffer from any severe mental impairments and that no physician of record opined that Adkins met or medically equaled Listing 12.05C.

We refuse to overturn or reject the ALJ's findings if they are supported by substantial evidence. *See Blakes v. Barnhart*, 331 F.3d 565, 568 (7th Cir. 2003). The ALJ's decision is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). We will not reweigh the evidence or substitute our judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

On appeal, Adkins argues that the ALJ improperly discounted evidence supporting his claim that he was mentally retarded and thus met Listing 12.05C. These are the four requirements for a finding of mental retardation under Listing

12.05C: (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning initially manifested during the developmental period before age 22; (3) a valid verbal, performance, or full scale IQ of sixty through seventy; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.05; *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Adkins points to his placement in special education classes during childhood; Dr. Spencer's determination that he had a mild mental handicap, with IQs of sixty-eight, seventy, and sixty-six; Dr. Berry's conclusion that he suffered from depression, anxiety, and possible borderline personality disorder; and Dr. Carter's finding that he could not work due to chronic pain and breathing problems.

After our review of the record, we are of the opinion that Adkins has failed to establish that he met the requirements of Listing 12.05C because his IQ test scores were inconsistent with other evidence of his cognitive stability and were thus invalid. Dr. Spencer's own evaluation questioned the validity of the IQ test she performed. Significantly, Dr. Spencer refrained from making a diagnosis of mental retardation. Dr. Thomas testified at length regarding his reasons for questioning the credibility of some of the findings made by Drs. Berry and Spencer, explaining that the results of Adkins's MMPI test cast doubt on the validity of the IQ tests. Dr. Thomas explained that the MMPI test can only be completed by someone who has at least an 8th grade comprehension level, a level that is inconsistent with mental retardation. The MMPI test results led Dr. Thomas to conclude that Adkins's cognitive skills were "excellent" and that the IQ scores and findings of serious mental impairment were "invalid."

In addition, Adkins has failed to demonstrate significantly subaverage general intellectual functioning nor deficits in his adaptive functioning prior to age twenty-two, as required in the listing schedule. Indeed, aside from Adkins's testimony that he completed school only through the eighth grade, the record contains only minimal evidence concerning his cognitive and medical state before he reached twenty-two years of age. The fact that Adkins was able to be gainfully employed until the age of forty-one without material complaints from his employers further exemplifies his adaptive abilities. Although low IQ scores are indicative of retardation, other factors, such as the claimant's life activities and employment history, must be considered and weighed and properly play into the ALJ's analysis. *See Mendez v. Barnhart*, 439 F.3d 360, 361 (7th Cir. 2006) (noting that because IQ of seventy is just at borderline of mental retardation, grid requires additional impairment to establish disability); *Maggard*, 167 F.3d at 380 (low IQ scores did not demonstrate mental retardation where claimant showed an ability to perform his

work assignments, understand and follow directions, relate to coworkers, and withstand the stress of daily work).

Adkins also argues that because the ALJ failed to discuss Listing 12.05C we must remand the case. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand"). It is true that the ALJ did not refer to the Listing—which would have been helpful—and thus we are somewhat at a loss to be able to ascertain how meaningfully he considered it. However, we are convinced that the ALJ's treatment and consideration of this issue certainly was not done in a perfunctory fashion. The ALJ ordered a supplemental hearing in order that Adkins might be examined by two psychologists and have his psychological condition examined more thoroughly. The ALJ devoted several pages of his decision to an exhaustive discussion of the psychological and intelligence testing, weighing the opinions of the mental health specialists, and considering the issues relevant to Listing 12.05C, including the results of various intelligence and psychological tests as well as physical medical examinations. After his examination and weighing of this evidence, the ALJ concluded that Adkins "does not have a 'severe' emotional, mental, psychological, or psychiatric impairment as contemplated by the Social Security Act" and that he "does not have any limitations or restrictions due to any emotional, mental, psychological, or psychiatric impairment."

Next, Adkins asserts that the ALJ's adverse credibility determination violated Social Security Ruling 96-7p, which requires an ALJ to provide "specific reasons" for a credibility determination and not simply state that "the individual's allegations have been considered" or that "the allegations are credible." SSR 96-7p. After reviewing Adkins's medical and employment history and questioning him personally, the ALJ stated that his "veracity in general is somewhat suspect." We defer to a credibility finding and will reverse only if the finding is "patently wrong." *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citation omitted). The ALJ based his determination on a combination of medical evidence—including Dr. Spencer's belief that Adkins may be exaggerating his symptoms—and the ALJ's own perception of Adkins as a witness. Because the ALJ's credibility finding is supported by the record, it should not be disturbed. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005).

Adkins also argues that the ALJ erred in formulating his RFC—by not factoring in his alleged mental retardation—and that the ALJ improperly found that he could adequately perform the jobs he previously held. As discussed above, substantial evidence supports the ALJ's conclusion that Adkins was not mentally retarded. The record reflects substantial evidence supporting the ALJ's finding that

Adkins could perform sedentary work away from harsh environmental conditions troublesome to his pulmonary problems. Furthermore, the ALJ calculated that there are over 17,000 sedentary and light unskilled occupations throughout the state of Indiana that Adkins would be capable of performing.

Finally, Adkins contends that the ALJ failed to provide a "fair determination" of his disability claim because he used "misleading rhetorical devices;"[3] considered psychological research from outside the record; reported that Carter found Adkins was not totally disabled; and improperly excused Thomas' failure to complete an evaluation of Adkins's ability to work. In our opinion, these arguments are without merit and warrant but limited discussion. Adkins cites *Ray v. Brown*, 843 F.3d 998 (7th Cir. 1988), for the proposition that disability claimants are entitled to a "fair hearing." In this case, we observe that the ALJ reviewed and developed a thorough record dealing with Adkins's mental health and conducted an extensive hearing with a psychological medical expert. This record and medical evidence, when considered in its entirety, defeats Adkins's claim of unfairness. Adkins also suggests that it was a violation of the Federal Rules of Evidence for the ALJ to consult a medical reference text from outside the record. However, the Federal Rules of Evidence do not apply in Social Security disability hearings. *See* 42 U.S.C. § 405(b)(1). Ultimately, Adkins has failed to demonstrate that the ALJ exhibited sufficient antagonism to a degree that would constitute a denial of due process. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

AFFIRMED.

---

[3] Adkins complains, for example, that the ALJ "exaggerated" the significance of his own medical experts' evidence by repeatedly stating that this evidence was provided by a "board certified" or "licensed" practitioner, without applying the same descriptive phrases to Adkins's primary care physicians, who were also certified and licensed.