**Mary L. BLACKSTOCK, Plaintiff,**

**v.**

**Michael J. ASTRUE, Commissioner of the Social Security Administration, Defendant.**

**Civil Action No. H–06–3364.**

United States District Court,
S.D. Texas,
Houston Division.

Dec. 6, 2007.

William C. Herren, Herren Law Office, Houston, TX, for Plaintiff.

Jose Ricardo Hernandez, SSA Office of the General Counsel, Dallas, TX, for Defendant.

## MEMORANDUM AND ORDER

CALVIN BOTLEY United States Magistrate Judge.

Pending before the Court is Plaintiff Mary L. Blackstock's ("Blackstock") mo-

tion for summary judgment and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration ("Commissioner"),[1] response to Blackstock's motion for summary judgment. Blackstock appeals the determination of an Administrative Law Judge ("the ALJ") that she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental security income benefits. *See* 42 U.S.C. §§ 216(i), 226, and 1614(a)(3)(A). Having reviewed the pending motion, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Blackstock's Motion for Summary Judgment (Docket Entry No. 13) should be denied, and the ALJ's decision denying benefits be affirmed.

## I. *Background*

On August 25, 2003, Blackstock filed applications for supplemental security income and disability insurance benefits, alleging that she had been disabled and unable to work since May 1, 2000. (R. 15, 60). Blackstock alleged that she suffers from high blood pressure (hypertension),[2] breathing problems, dizzy spells, back pain, and depression. (R. 71). Both applications were denied initially and on reconsideration. (R. 15, 23, 24). Blackstock requested, and was granted, an administrative hearing before an ALJ to review the decisions. (R. 38–41).

A hearing was held on March 6, 2006, in Houston, Texas, at which time the ALJ heard testimony from Blackstock and Lorie McQuade, a vocational expert ("VE"). (R. 329–46), In a decision dated April 10, 2006, the ALJ denied Blackstock's application for benefits. (R. 18–24). Blackstock appealed the decision to the Appeals Council of the SSA's Office of Hearings and Appeals, which, on August 25, 2006 (R. 5–7), declined to review the ALJ's determination, rendering the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Blackstock filed her original complaint in this case on October 23, 2006, seeking judicial review of the Commissioner's denial of her claims for benefits. *See* Docket Entry No. 1.

## II. *Analysis*

### A. *Statutory Bases for Benefits*

SSI-benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed.2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of *indigence* and *disability.* *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)–(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled. *See Brown v. Apfel,* 192 F.3d 492, 495 n. 1 (5th Cir.1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

1. Michael J. Astrue was appointed Commissioner of the Social Security Administration effective February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. "Hypertension" refers to high arterial blood pressure. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 858 (29th ed.2000).

When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, September 2003, fixes the earliest date from which benefits can be paid. (R. 60). Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See* also SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled,* regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger,* 516 F.2d 1005, 1007 n. 1 (5th Cir.1975); *see also Perkins v. Chater,* 107 F.3d 1290, 1295 (7th Cir.1997). For purposes of Title II disability benefits, Blackstock was last insured on December, 31 2003. (R. 15). Consequently, to be eligible for disability benefits, Blackstock must prove that she was disabled prior to that date. (R. 15).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI. *See Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

### B. *Standard of Review*

#### 1. *Summary Judgment*

The court may grant summary judgment under FED.R.CIV.P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving patty, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.,* 201 F.3d

570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000).

### 2. *Administrative Determination*

■■■ Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

■■■ When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.* at 272.

### C. *ALJ's Determination*

■■■ An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 416.920(e).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*See Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir.2000); *accord Boyd,* 239 F.3d at 705. The claimant has the burden to prove disability under the first four steps. *See Myers,* 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson,* 309 F.3d at 272; *Greenspan,* 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd,* 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

▬ The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton,* 209 F.3d at 452; *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990); *Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir.1988); *Cook v. Heckler,* 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel,* 238 F.3d 592, 594 (5th Cir.2001); *accord Newton,* 209 F.3d at 452; *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999); *Selders,* 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activi-

ty" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton,* 209 F.3d at 452–53; *see also* 20 C.F.R. § 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler,* 707 F.2d 162, 165 (5th Cir.1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if h[er] impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . .'" *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir.1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2003.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision per her testimony and earnings record (Exhibit 6D) (20 C.F.R. §§ 404.1520(b) and 416.920(b)).

3. The claimant has the following "severe" impairments: cardiomegaly, congestive heart failure, hypertension, diabetes mellitus, obesity, hypoxia, hypoventilation, a mood disorder, and borderline intellectual

functioning (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings 3.00, 4.00, 9.00, and 12.00 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).

5. The claimant has the residual functional capacity for sedentary work, that is the ability to occasionally lift and carry 10 pounds, stand and walk (with normal breaks) for 2 hours in an 8–hour workday, and sit (with normal breaks) for 6 hours in an 8–hour workday. She should avoid concentrated exposure to pulmonary irritants such as dust, fumes, and gases. She is restricted to unskilled work.

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(R. 17–18, 20). As to the fifth step, the ALJ concluded:

7. The claimant ... is 47 years old, which is a "younger individual" age 45–49 (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.963).

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above per the opinion of the vocational expert (20 C.F.R. §§ 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966).

(R. 20).

■ This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d at 619; *Newton,* 209 F.3d at 452; *Greenspan,* 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Blackstock's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir.1995); *Wren v. Sullivan,* 925 F.2d 123, 126 (5th Cir.1991) (citing *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ, and not the court. *See Newton,* 209 F.3d at 452; *Brown,* 192 F.3d at 496; *Martinez,* 64 F.3d at 174; *Selders,* 914 F.2d at 617.

## D. *Issues Presented*

■ Blackstock contends that the ALJ committed error at step three of the evaluation process by failing to find that Blackstock met or equaled Listing 12.05C (*i.e.,* mental retardation). *See* 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.05. Blackstock argues that by the ALJ's own findings, specifically, his findings that Blackstock has borderline intellectual functioning and other "severe" physical conditions, the ALJ should have found that the elements

of Listing 12.05C were satisfied. *See* Docket Entry No. 13. The Commissioner disagrees with Blackstock's contentions, maintaining that she does not satisfy the threshold requirements of Listing 12.05C; that is, a diagnostic description of mental retardation established prior to age 22. *See* Docket Entry No. 14.

### E. *Review of the ALJ's Decision*
### 1. *Objective Medical Evidence and Opinions of Physicians*

 When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532, 110 S.Ct. 885; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n. 16, 110 S.Ct. 885; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir.2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will

be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 416.923; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531, 110 S.Ct. 885.

 The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530–31, 110 S.Ct. 885; *Selders*, 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect. *See Zebley*, 493 U.S. at 529–30, 110 S.Ct. 885. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530, 110 S.Ct. 885. For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria. *See id.*

 For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairments, she must present medical findings equal in severity to all the criteria for the one most similar listed impairment. *See id.* at 531, 110 S.Ct. 885 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 416.926(a). The applicable regulations further provides:

> (1)(i) If you have an impairment that is described in the Listing of Impairments

in appendix 1 of subpart P of part 404 of this chapter, but—

(A) You do not exhibit one or more of the medical findings specified in the particular listing, or

(B) You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii) We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance. 20 C.F.R. § 416.926(a). Nonetheless, "[a] claimant cannot quality for benefits under the 'equivalence' step by showing that the overall functional impact of h[er] unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley,* 493 U.S. at 531, 110 S.Ct. 885. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Selders,* 914 F.2d at 619; *see also* 20 C.F.R. § 416.927(e).

A review of the medical records submitted in connection with Blackstock's administrative hearing reveals that Blackstock submitted to a psychological evaluation on August 1, 2003, conducted by Richard Stiens, Ph.D. ("Dr. Stiens"). The results of Blackstock's WAIS–III test indicated that she had borderline intellectual functioning with a full scale IQ score of 70. (R. 176). On the achievement test, Black-

stock obtained slightly higher scores than expected based on her performance on the intelligence test. (R. 178). Moreover, from the results of the psychological evaluation, Blackstock was assessed at having junior high school level academic abilities. (R. 179). During her psychological evaluation, Blackstock denied a history of learning disabilities and admitted that she was never enrolled in special education classes. (R. 177). Accordingly, Blackstock graduated from high school and subsequently attended Barclay Career School in Houston, Texas for one year. (R. 177). Further, Blackstock has maintained various jobs throughout her lifetime in the areas of cooking, housekeeping, laundry, and apartment management. (R. 177).

According to the record, Blackstock's alleged disabling conditions were not in the realm of intellectual shortcomings. In May of 2002, Leonel Perfecto Welch, M.D. ("Dr. Welch"), from The University of Texas Medical Branch at Galveston, diagnosed Blackstock with hypoventilation[3], hypertension, hypoxia[4], and obesity[5]. (R. 136–37). A sleep study was conducted, where Dr. Welch found no evidence of obstructive sleep apnea syndrome[6]. (R. 137). Dr. Welch prescribed CPAP to be used until the patient began using BiPAP at home and also noted that Blackstock's hypoxia was fairly well controlled by 3. L.P.M. supplemental oxygen. (R. 137). During this period of time, Blackstock's height and

---

3. "Hypoventilation" is characterized by a reduction in the amount of air entering the pulmonary alveoli, which results in increased carbon dioxide tension. *See* DORLAND'S, *supra,* at 869,

4. "Hypoxia" is a reduction of oxygen supply to tissue below physiological levels. This reduction of oxygen supply occurs despite adequate perfusion of the tissue by blood. *See* DORLAND'S, *supra,* at 869.

5. "Obesity" is the term given to a condition of increased body weight beyond the skeletal

and physical limitations as a result of an excessive accumulation of body fat. *See* DORLAND'S, *supra,* at 1251.

6. "Sleep apnea" is characterized by transient periods of cessation of breathing during sleep. *See* DORLAND'S, *supra,* at 114. "Obstructive sleep apnea" results from a collapse or an obstruction of the airway with the inhibition of muscle tone that occurs during REM sleep. It occurs mostly in middle-aged obese individuals. *See id.*

weight were noted at 67 inches and 313 pounds, respectively. (R. 137). A physical examination showed morbid obesity and 2–3+ edema in the extremities. (R. 154). Dr. Welch recommended weight loss to the ideal body weight range, but the claimant was non-compliant with her recommended diet. (R. 137).

Blackstock's August 1, 2003 psychological evaluation was reviewed by Glen E. McClure, Ph.D. ("Dr. McClure") before he conducted Blackstock's clinical interview and mental status exam. (R. 180). Dr. McClure noted that Blackstock was a poor historian and was tearful throughout the interview. (R. 180). It was also noted that Blackstock was grossly obese and had an unkempt appearance. (R. 180). During this interview, Blackstock complained of obesity, high blood pressure, back problems, dizzy spells, sleep apnea, breathing problems, memory loss, and depression. (R. 180). Blackstock also described that her typical day consists of going to different churches to seek donations of funds to help pay her utilities and food expenses. (R. 181). She admitted to living alone and taking care of her own bathing, dressing and grooming, but acknowledged that she does have difficulty bathing and dressing due to her obesity. (R. 181).

From Blackstock's mental status examination, Dr. McClure noted that Blackstock presented her thoughts in "an organized, logical and a coherent manner." (R. 182). Although during the exam Blackstock said she could not think and could not continue, Dr. McClure noticed no disorganization or loosening of association. (R, 182). Dr. McClure also noted that Blackstock was

"oriented to person, place, time and circumstances," although her intellectual level is in the "low average to borderline range." (R. 182). Dr. McClure diagnosed Blackstock with mood disorder [7] due to her multiple health problems, high blood pressure, back problems which prevent her from standing for a long time, dizzy spells, sleep apnea, and breathing problems for which she uses oxygen at night. (R. 183).

In September of 2003, a state agency medical consultant, Frederick Cremona, M.D. ("Dr. Cremona") noted that "[Blackstock's] alleged limitations are not wholly supported by medical evidence or other info in file." (R. 216). Blackstock reported being 73″ and 296 lbs., when in fact her height and weight are 67″ and 313 lbs, respectively. (R. 218). Henry M. Hanna, Ph.D. ("Dr. Hanna") noted that a residual functional capacity assessment was necessary and based his medical disposition on listing 12.04—Affective Disorders and 12.05—Mental Retardation. (R. 239). Upon examination, Dr. Hanna assessed Blackstock as having a light functional capacity, noting that "claimant can understand, remember, and carry out simple instruction, make simple decisions, attend and concentrate for extended periods, interact adequately [with] co-workers and supervisors, and respond appropriately to changes in routine work settings." (R. 221). Blackstock indicated that she was able to cook, shop, handle money, drive a car, write notes, attend church and go fishing, but that her obesity limited her. (R. 251). Accordingly, Dr. Hanna diagnosed Blackstock with major depressive disorder [8], noting that the condition was

---

7. "Mood disorder" is a general reference to mental disorders whose essential feature is a disturbance of mood manifested as one or more episodes of mania, hypomania, depression, or some combination. Functional mood disorders are subclassified, *e.g.,* depressive disorders, which includes major depressive

disorder and dysthymic disorder. *See* Dorland's, *supra,* at 530.

8. "Major depressive disorder" denotes a mood disorder characterized by the occurrence of one or more major depressive episodes and the absence of any history or

recurrent, severe, and without psychotic features, and with borderline intellectual functioning. (R. 242–43).

Medical records from The University of Texas Medical Branch at Galveston show that Blackstock was diagnosed with pneumonia, shortness of breath, depression with suicidal ideation[9], sleep apnea, and hypertension in December of 2003. (R. 229). During this visit, Blackstock admitted to smoking cigarettes and marijuana. (R. 231). Blackstock was prescribed Maxzide for her hypertension and Prozac for her depression. (R. 233).

On January 18, 2004, Blackstock was diagnosed with acute bronchitis after complaining of a chronic cough and fever. (R. 270–75). On March 14, 2004, Blackstock was admitted to The University of Texas Medical Branch at Galveston ("UTMB") for suicidal ideation with a plan to jump into a lake. (R. 257). The attending physician noted that Blackstock's mood was depressed and her thought process seemed disorganized. (R. 257). Although her attention and concentration were impaired, Blackstock's immediate memory was intact, her fund of knowledge was fair, and her intellectual functioning was below average. (R. 257). Blackstock was diagnosed with major depressive disorder with psychotic features and was voluntary placed on suicide precautions. (R. 257). On March 19, 2004, Blackstock was dis-

charged after reporting that her suicidal ideation had resolved and she was ready to go home. (R. 258). During this visit, Blackstock was also diagnosed with hypertension, morbid obesity, obstructive sleep apnea, diabetes mellitus,[10] and onychomycosis.[11] (R. 258). In May of 2004, Blackstock visited the UTMB Department of Dermatology and visited the emergency room on December 27, 2004 complaining of loose stools and vomiting accompanied by a cough. (R. 253–55).

On December 30, 2004, Blackstock visited the Angleton Danbury Medical Center ("Angleton") where she was diagnosed with mild pulmonary edema.[12] (R. 298–301). In January and February of 2005, Blackstock visited the medical center complaining of shortness of breath. (R. 285–297). The medical records show that Blackstock was a heavy smoker, smoking one pack of cigarettes per day. (R. 296). The records indicate that she had quit smoking recently. (R. 296). The records also indicate that Blackstock was non-compliant with her previously prescribed oxygen and CPAP. (R. 296). Blackstock was diagnosed with acute chronic respiratory failure, hypertension, sleep apnea syndrome, and cardiomegaly.[13] (R. 295, 290).

On June 15, 2005, Blackstock was again admitted to Angleton complaining of weakness. (R. 281). Various tests were conducted and results were mostly normal.

manic, mixed, or hypomanic episodes. *See* DORLAND's, *supra,* at 530.

**9.** "Suicidal Ideation" is a formation of thoughts of terminating one's own life. *See* DORLAND's, *supra,* at 874, 1724.

**10.** "Diabetes mellitus" is a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance. *See* DORLAND's, *supra,* at 489.

**11.** "Onychomycosis" or "tinea unguium" is a type of dermatophytoses of humans, involving the nails and usually caused by a combination

of bacteria and fungi. *See* DORLAND's, *supra,* at 1263, 1843.

**12.** "Pulmonary edema" is the abnormal, extravascular accumulation of fluid in the pulmonary tissues and air spaces. It is caused by changes in the hydrostatic forces in the capillaries or to increased capillary permeability. *See* DORLAND's, *supra,* at 568.

**13.** "Cardiomegaly" is hypertrophy of the heart. *See* DORLAND's, *supra,* at 287.

(R. 283). The records indicate that Blackstock's tobacco consumption was one pack of cigarettes every three days, indicating that Blackstock had resumed her tobacco abuse. (R. 282). Most recently, in September of 2005, Blackstock visited Angleton complaining of vomiting and diarrhea arising out of an hurricane evacuation trip. (R. 276). A neurological evaluation during this visit reported that Blackstock was alert and oriented to person, place, and time and her judgment seemed appropriate. (R. 276). The record also indicates that Blackstock had a depressed affect and looked chronically ill. (R. 276).

 "[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan,* 38 F.3d at 237; *accord Myers,* 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir. 1985). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott,* 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers,* 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Greenspan,* 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers,* 238 F.3d at 621; *Newton,* 209 F.3d at 456; *see also Brown,* 192 F.3d at 500; *Greenspan,* 38 F.3d at 237; *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir.1994). It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul,* 29 F.3d at 211; *accord Myers,* 238 F.3d at 621; *Newton,* 209 F.3d at 455.

Based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Blackstock suffered from impairments which did not meet or equal the requirements of a listing. Blackstock claims the ALJ erred by not finding that the elements of Listing 12.05C were satisfied. *See* Docket Entry No. 13, pp. 5–7. The Commissioner contends that Blackstock does not meet the threshold requirements of Listing 12.05C. Particularly, the Commissioner contends that no evidence in the record indicates that Blackstock meets the Listing 12.05C requirement that the diagnostic description of mental retardation be established prior to age 22. *See* Docket Entry No. 14, p. 7.

### 2. *Mental Retardation Listing 12.05C*

In the case at bar, Blackstock's sole argument is that the ALJ failed to find that her condition fits the requirements of Listing 12.05C (*i.e.,* mental retardation). *See* Docket Entry No. 13. The determination by the examining psychologist, Dr. Stiens, that Blackstock's intellect tested in the mentally deficient range between 60 and 70, with a verbal IQ of 76, performance IQ at 69, and full scale IQ of 70, reflects that Blackstock's scores merited consideration, solely with respect to intelligence proficiency, as mentally retarded for disability purposes. Blackstock's full scale IQ score indicates that she meets the subaverage general intellectual function criteria required by listing 12.05C, which provides:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\* \* \*

 C. A valid verbal, performance, or full scale IQ of 60–70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*See* 20 C.F.R. pt. 404, subpt. P. App. 1 § 12.05

 The Commissioner argues that in the absence of a finding that Blackstock was mentally retarded, she cannot meet the criteria of Listing 12.05C. *See* Docket Entry No. 14, pp. 4–5. The Commissioner's argument is misplaced. Although the requirements of Listing 12.05's introductory paragraph are mandatory, it does not require a formal diagnosis of mental retardation. *See Maresh v. Barnhart,* 438 F.3d 897, 899 (8th Cir.2006); *see also Adkins v. Astrue,* 226 Fed.Appx. 600, 604–05 (7th Cir.2007); *see also Markle v. Barnhart,* 324 F.3d 182, 187 (3d Cir.2003). To meet the requirements of Listing 12.05C, a claimant must show: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh,* 438 F.3d at 899. The ALJ found Blackstock had borderline intellectual functioning, but did not specifically determine that Blackstock was mentally retarded. Because a formal diagnosis of mental retardation is not required, the claimant need only exhibit deficits in adaptive functioning[14] manifested prior to the age of twenty-two. *See Witt v. Barnhart,* 446 F.Supp.2d 886, 895 (N.D.Ill. 2006).

In the present case, Blackstock was unable to establish that she had such mental deficiencies, prior to reaching age twenty-two, and, further failed to display the adaptive functioning deficits necessary to meet the impairment listing set forth in 12.05C. Dr. Stiens' findings, in fact dispelled such a conclusion, by determining that despite her intelligence testing, Blackstock was found to have high school level reading, eighth grade spelling and seventh grade arithmetic capabilities; somewhat higher scores than would be expected from her intellectual assessment scores. (R. 178). Furthermore, Blackstock's ability to complete high school and over a year of vocational school is a further indication that she does not suffer from the required deficits in adaptive functioning. (R. 178). The determination reached by objective observers from Blackstock's medical history, that she is able to live independently and is capable of attending to her basic needs, *i.e.*, dressing herself; preparing simple meals; and attending churches to ask for donations (R. 181, 251), in spite of her limited mental functioning capabilities, is further evidence that her condition does not comport with the limitations in adaptive functioning generally. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM–IV–TR") 39 (4th ed.2000). Finally, Blackstock's ability to work as a cook, housekeeper, and apartment manager for years prior to onset of her alleged disability (R. 177), despite her mental limitations, constitutes additional *indicia* mili-

---

**14.** Adaptive Functions include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(1).

tating against a finding that she is adaptive functioning deficient to a degree that would be reasonably considered disabling. *See, e.g., Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir.1990).

Blackstock also had the opportunity to let the ALJ know of her alleged mental retardation when the ALJ questioned Blackstock, during the hearing, about her reasons for not being able to work in which Blackstock replied that she had "breathing problems and a whole lot of other stuff." (R. 334). Blackstock's attorney questioned her about her ability to walk, climb stairs, ride a bus, and stoop down; none of which indicate whether Blackstock now exhibits, or exhibited before the age of twenty-two, deficits in her adaptive functioning. (R. 336–38, 344–45).

The ALJ addressed Blackstock's mental limitations and found that Blackstock had "only 'mild' difficulties in maintaining social functioning based on her testimony and description of her social and daily living activities," and that these limitations further restricted Blackstock to unskilled work. (R. 20). The ALJ summarized Blackstock's mental limitations as follows:

> In regard to mental limitations, psychological testing administered on August 1, 2003, indicated borderline intellectual functioning with a full scale IQ score of 70 (Exhibit 5F). However, the claimant graduated from high school, was employed, and otherwise demonstrated that she is not impaired by mental retardation. A psychological examination dated from March 2004 indicated a mood disorder. Dr. Glen McClure commented that the claimant's treatment for depression had been limited to a trial of one antidepressant and that she had not received any psychotherapy, but that her medical problems appeared to be her primary complaint. The claimant was largely uncooperative with the mental status examination; other than that, the,

examination was unremarkable (Exhibit 6F).

> A state agency medical consultant reviewed this evidence and assessed that the claimant can understand, remember, and carry out simple instruction, make simple decisions, attend and concentrate for extended periods, interact adequately with coworkers and supervisors, and respond appropriately to change in routine work settings (Exhibit 9F). A state agency psychological consultant assessed no restriction of activities of daily living, 'moderate' deficiencies of concentration, persistence or pace that result in failure to complete tasks in a timely manner, and no episodes of deterioration or decompensation, each of extended duration.

(R. 19–20).

The ALJ, therefore, properly found that in reliance upon the medical evidence, including the conclusions of the treating and consulting physicians; the testimony of vocational experts; and Blackstock's testimony as to her capabilities, that Blackstock's alleged mental impairment did not, singly or in combination with her other alleged impairments, prevent her from performing the light unskilled jobs found to exist in significant numbers in the national economy.

### 3. *Subjective Complaints*

 The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker,* 655 F.2d 645, 648–49 (5th Cir.1981)). When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley v. Chater,* 67 F.3d 552, 556 (5th Cir.1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective

complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.*

██ It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir.2001); *Scott v. Shalala,* 30 F.3d 33, 35 n. 2 (5th Cir.1994); *Falco,* 27 F.3d at 164; *Wren,* 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco,* 27 F.3d at 164 n. 18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen,* 862 F.2d 471, 481 (5th Cir.1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler,* 770 F.2d 1276, 1281–82 (5th Cir.1985)); *accord Chambliss,* 269 F.3d at 522 (citing *Houston v. Sullivan,* 895 F.2d 1012, 1016 (5th Cir.1989)); *Hampton v. Bowen,* 785 F.2d 1308, 1309 (5th Cir.1986).

██ As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames,* 707 F.2d at 166; *Epps v. Harris,* 624 F.2d 1267, 1274 (5th Cir.1980); *accord Brown v. Bowen,* 794 F.2d 703, 707 (D.C.Cir.1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan,* 887 F.2d 92, 96 (5th Cir.1989); *Owens,* 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss,* 269 F.3d at 522; *Johnson v. Heckler,* 767 F.2d 180, 182 (5th Cir.1985).

██ For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to

therapeutic treatment." *Chambliss,* 269 F.3d at 522; *Falco,* 27 F.3d at 163; *Wren,* 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss,* 269 F.3d at 522; *Wren,* 925 F.2d at 128; *James v. Bowen,* 793 F.2d 702, 706 (5th Cir.1986). However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *Dunbar v. Barnhart,* 330 F.3d 670, 672 (5th Cir.2003) (citing *Wren,* 925 F.2d at 128 (citation omitted)).

██ At the administrative hearing, Blackstock testified regarding her health problems and the pain associated with those problems. (R. 334–39, 344–45). The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Blackstock's pain:

The claimant alleged breathing problems and moodiness and forgetfulness from depression. She stated mat she weighs 390 pounds and is 69 inches tall. She explained that her doctor recommended an 1800 calorie diet but she had been unable to comply with it. In response to questioning from her attorney, she was unable to specifically state how far she could walk; she has difficulty walking due to her weight, leg pain, and shortness of breath, and when climbing stairs, she must stop due to shortness of breath. She uses oxygen. She has been coughing recently, which she attributes to pneumonia. She maintained that she had not used marijuana for more than four years and had not smoked cigarettes for two weeks.

After considering the evidence of record, I find that the claimant's "severe" impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concern-

ing intensity, duration and limiting effects of these symptoms are not entirely credible.

(R. 18). The ALJ's finding is supported by the medical records. The objective medical evidence, as summarized above, demonstrates that Blackstock's conditions were not as debilitating as alleged and indicates that she is fairly capable despite her impairments. (R. 18).

Moreover, Blackstock's failure to follow a physician's prescribed treatment program is a legitimate basis for denial of benefits. *See Johnson v. Sullivan,* 894 F.2d 683, 685 n. 4 (5th Cir.1990). In May of 2002, Blackstock was placed on a recommended diet by her physician, Dr. Welch, but she was non-compliant. (R. 137). Similarly, in December of 2004, Blackstock was non-compliant with her prescribed oxygen and CPAP and continued smoking cigarettes. (R. 296, 282). Accordingly, it is proper for the ALJ to conclude that impairments that are controllable or amenable to treatment do not support a finding of disability. *See Johnson,* 864 F.2d at 348; *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir.1987). In the present case, Blackstock acknowledged that she was trying to quit smoking and that weight loss would improve her condition and stated during her hearing that she was "trying to lose weight" because she wanted to "do better". (R. 335–36).

The Court does not doubt that Blackstock suffers from pain; however, the records do not support a finding that Blackstock's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss,* 269 F.3d at 522; *Falco,* 27 F.3d at 163; *Wren,* 925 F.2d at 128. Accordingly, there is substantial evidence that supports the ALJ's finding that Blackstock's subjective reports of pain do not rise to the level of disability.

### 4. *Residual Functional Capacity*

 Under the Act, a person is considered disabled:

> ... only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work....

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 216; *Myers,* 238 F.3d at 619; *Greenspan,* 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson,* 309 F.3d at 272; *Boyd,* 239 F.3d at 705; *Shave,* 238 F.3d at 594; *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir.2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" ("RFC") must be assessed. *See Moore v. Sullivan,* 895 F.2d 1065, 1068 (5th Cir.1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan,* 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 416.945. RFC combines a medical assessment with the

descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir.1986); *see also* 20 C.F.R. § 416.945.

When a claimant's RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 416.920. The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir.1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir.1995).

 In evaluating a claimant's RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing RFC and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96–8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past

relevant work.... RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.... The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id* (internal citations omitted); *see* 61 Fed. Reg. 34474–01 (July 2, 1996). The court further commented:

> Second, SSR 96–9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities.... The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96–9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional re-

quirements on a sustained basis. *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Mathews*, 545 F.2d 975, 977–78 (5th Cir.1977)).

In the case at the bar, the ALJ found Blackstock had the RFC for unskilled, sedentary work.[15] (R. 18). The ALJ restricted Blackstock's RFC, however, by indicating that she "should avoid concentrated exposure to pulmonary irritants such as dust, fumes, and gases." (R. 18). The ALJ noted that if the claimant had the RFC to perform any type of sedentary work, a finding of "not disabled would be appropriate, directed by Medical–Vocational Rule 201.1." (R. 21). Moreover, due to the further limitations the ALJ placed on Blackstock's RFC, the ALJ consulted a VE in order to determine the extent to which these limitations eroded the unskilled sedentary occupational base. When asked for a specific classification of her past work as far as the exertional and skill level, the VE answered as follows:

> Review of this record, specifically Exhibits 2E–3 through 8 and 5E–1 through 8, reveal performance of three occupations in the relevant period for consideration. They include a housekeeper/cleaner, which is a light, unskilled occupation, a cafeteria cook, which is a medium, semi-skilled occupation. And a social services aide, which is also a light, semi-skilled occupation. And those are all classified and defined by [t]he Dictionary of Occupational Titles.

(R. 340–41). The VE's response to the ALJ's hypothetical questions regarding possible jobs in the national and regional economy that an individual restricted to sedentary work and avoidance of concentrated exposure to pulmonary irritants would be capable of performing was as follows:

> Although there would be no transferability of the skill sets to the sedentary level of physical exertion, it's my opinion that review of the sedentary, unskilled job base, administratively noticed by the commissioner, would not be eroded at all.

(R. 340–41).

In reaching his decision, the ALJ properly considered Blackstock's physical RFC, age, educational background, and work history. (R. 20). The ALJ concluded that although Blackstock is unable to perform any past relevant work, there are jobs that exist in significant number in the national economy that she can perform. The VE testified that there were a significant number of unskilled, sedentary jobs that a person with Blackstock's vocational profile and physical RFC could perform. (R. 342). The VE specifically noted that Blackstock could work as a ticket seller or a telephone quotation clerk; occupations that exist by approximately 75,000 to 100,000 in the local regional economy and over 3.5 million in the national economy, and 25,000 to 30,000 in the local regional economy and over one million in the national economy, respectively.

The Fifth Circuit has observed that in determining a claimant's ability to work, a VE "... is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *See Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir.2000). Unlike the Dictionary of Occupational Titles, which simply gives a general description of the job duties involved, a VE is able to compare the unique requirements of a specified job with the particular ailments a

---

**15.** The ALJ defined a RFC for sedentary work as "the ability to occasionally lift and carry 10 pounds, stand and walk (with normal breaks) for 2 hours in an 8–hour workday, and sit (with normal breaks) for 6 hours in an 8–hour workday." (R. 18).

claimant suffers in order to reach a reasoned conclusion as to whether the claimant can perform the specific job. *See Fields v. Bowen,* 805 F.2d 1168, 1171 (5th Cir.1986). Because the hypothetical questions articulated by the ALJ reasonably incorporated the restrictions and impairments recognized by the ALJ, the ALJ properly accepted the VE's testimony that Blackstock could perform work. Moreover, the ALJ's RFC accommodates limitations resulting from Blackstock's alleged impairments. (R. 17-21).

Accordingly, substantial evidence supports the ALJ's findings that Blackstock is capable of making a successful adjustment to other work that exists in the national economy. (R. 20).

### III. *Conclusion*

Accordingly, it is therefore

**ORDERED** that Blackstock's Motion for Summary Judgment (Docket Entry No. 13) is **DENIED.** It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED.** Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

### FINAL JUDGMENT

In accordance with the Memorandum and Order issued this day, it is hereby

**ORDERED** that Plaintiff Mary L. Blackstock's Motion for Summary Judgment (Docket Entry No. 13) is **DENIED.** It is further **ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

This is a **FINAL JUDGMENT.**